# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

No. 16-CR-00692 (JMF)

TOMS SAULGRIEZIS,

Defendant.

### SENTENCING MEMORANDUM ON BEHALF OF TOMS SAULGRIEZIS

ORRICK HERRINGTON & SUTCLIFFE
51 WEST 52ND STREET
New York, New York 10019
(212) 506-5000

*Attorneys for Defendant Toms Saulgriezis*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 1

I.      MR. SAULGRIEZIS' PERSONAL HISTORY ............................................................ 1

      A.    Mr. Saulgriezis' Upbringing and Family ............................................... 1

      B.    Mr. Saulgriezis' Education and Work History ...................................... 3

II.     RELEVANT FACTS CONCERNING THE OFFENSE CONDUCT ............................ 4

III.    PLEA AGREEMENT ............................................................................................... 6

SENTENCING ANALYSIS .................................................................................................... 6

I.      LEGAL STANDARD ............................................................................................... 6

II.     SENTENCING MR. SAULGRIEZIS TO TIME SERVED WOULD ACHIEVE
      THE GOALS OF 18 U.S.C § 3553(A) ..................................................................... 8

      A.    History and Characteristics of Defendant ............................................ 8

      B.    The Guidelines' Disproportionate Emphasis on Loss Amounts Overstates
            Mr. Saulgriezis' Minor Role in the Conspiracy .................................... 9

      C.    Mr. Saulgriezis Should Receive a Sentence Below the Guidelines Range
            to Avoid Sentencing Disparities ......................................................... 12

      D.    A Long Sentence Would Have a Tremendous Negative Impact on Mr.
            Saulgriezis' Daughter, Parents, and Sisters ........................................ 14

      E.    Mr. Saulgriezis' Acceptance of Responsibility for His Conduct and Post-
            Offense Rehabilitation Favor a Downward Variance .......................... 16

      F.    Request for Judicial Order of Removal ............................................... 17

CONCLUSION ................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007).................................................................6, 7

*Kimbrough v. United States*,
   552 U.S. 85 (2007)....................................................................7

*Koon v. United States*,
   518 U.S. 81 (1996)....................................................................7

*Pepper v. United States*,
   562 U.S. 476 (2011)..................................................................8

*Simon v. United States*,
   361 F. Supp. 2d 35 (E.D.N.Y 2005) .........................................7, 12

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................10, 11, 12

*United States v. Alba*,
   933 F.2d 117 (2d Cir. 1991).......................................................15

*United States v. Aleksandrs Mukans*,
   16 Cr. 692 (JFM) (S.D.N.Y. December 5, 2017).............................10

*United States v. Aleksandrs Mukans*,
   16 Cr. 692 (JFM) (S.D.N.Y. Jan 29, 2018)...................................14

*United States v. Barton*,
   76 F.3d 499 (2d Cir. 1996).........................................................16

*United States v. Bueno*,
   2010 WL 2228570 (S.D.N.Y. June 3, 2010) ...................................7

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) (*en banc*) .........................................6

*United States v. Emmenegger*,
   329 F. Supp.2d 416 (S.D.N.Y. 2004)............................................11

*United States v. Ford*,
   320 F. App'x 50 (2d Cir. 2009) ...................................................12

*United States v. Galante*,
    111 F.3d 1029 (2d Cir. 1997)................................................................14

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ..................9, 10, 11

*United States v. Ivars Ozols*,
    16 Cr. 692 (JFM) (S.D.N.Y. January 29, 2019)................................14

*United States v. Ivars Ozols*,
    16 Cr. 692 (JMF) (February 12, 2019) ................................14

*United States v. Jones*,
    531 F.3d 163 (2d Cir. 2008)................................................................7

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ................................10, 11

*United States v. Wills*,
    476 F.3d 103 (2d Cir. 2007), *abrogated on other grounds by Kimbrough*, 552
    U.S. 85 (2007)................................................................12

*United States v. Wong*,
    40 F.3d 1347 (2d Cir. 1994)................................................................16

**Statutes**

8 U.S.C. §1228(c)(5) ................................................................17

18 U.S.C. § 981(a)(1)(C) ................................................................6

18 U.S.C. § 1349 ................................................................6, 16

18 U.S.C. § 3553 ................................................................6, 7, 8

18 U.S.C. § 3553(a)(1)-(2) ................................................................7

18 U.S.C. § 3553(a)(6) ................................................................7, 12, 14

28 U.S.C. § 2461(c) ................................................................6

Immigration and Naturalization Act of 1986................................17

**Other Authorities**

Loss Amounts by Selected Primary Sentencing Guidelines ( *available at*
    https://isb.ussc.gov/api/repos/:USSC:table_xx.xcdf/generatedContent?table_n
    um=Table102)................................................................13

Sentence Length for Offenders in Each Criminal History Category by Primary
 Sentencing Guideline (*available at*
 https://isb.ussc.gov/api/repos/:USSC:table_xx.xcdf/generatedContent?table_n
 um=Table14AG) ................................................................................................................... 13

Sentencing Commissions' Interactive Sourcebook of Federal Sentencing Statistics .................... 13

## PRELIMINARY STATEMENT

Toms' involvement in this conspiracy is inconsistent with how he has led the rest of his life:  focused on family, education, and work.  Adopted by a loving yet poor family, Toms overcame health obstacles as a young man to carve out a career for himself as a carpenter.  He used his skills to financially support his young daughter and her mother, as well as his parents and younger sisters.  Until engaging in this offense, Toms was a law-abiding, resilient, generous person.  Toms recognizes his improper and misguided conduct in this case but urges the Court to view it as a slipup in an otherwise peaceful, upstanding, and hardworking life.

Toms Saulgriezis respectfully submits this memorandum to assist the Court in formulating the appropriate sentence.  Toms submits that a just sentence should consider the approximately nine-and-a-half months he has been imprisoned, his personal circumstances (including the effect the sentence will have on his young daughter), his minor role in the conspiracy, and the below-Guidelines sentences imposed in similar cases (including this one).  For the reasons set forth below, Toms respectfully requests that the Court sentence him to time served.

## BACKGROUND

I.      **Mr. Saulgriezis' Personal History**

A.      **Mr. Saulgriezis' Upbringing and Family**

Toms Saulgriezis was born on September 18, 1990, in Riga, Latvia.  His biological parents immediately put Toms up for adoption.  As such, he has no recollection of them and has had no contact with them his entire life.  Janis and Dace Saulgriezis adopted Toms, their oldest

child, when Toms was approximately two months old.  Janis and Dace raised Toms as their own and are the only parents Toms has ever known.

Toms comes from a hardworking, blue collar family.  His father, Janis Saulgriezis, is 59 years old and works two jobs, as he has since Toms was born.  Janis is currently a warehouse manager and a butcher.  Toms' mother, Dace Saulgriezis, is a 54-year-old housewife.  The Saulgriezises have been married for over thirty years.  Toms has four younger sisters: Liga Singh, Ance Saulgriezis, Eva Belska, and Arta Saulgriezis.  Liga and Eva are adopted as well.  Liga is a 27-year-old housewife living in Dublin with one child and pregnant with another.  Ance is a 25-year-old waitress and assistant in a restaurant in Latvia.  Eva is an 18-year-old college freshman and waitress in Latvia.  Arta is an 18-year-old senior in high school.  Following in their parents' footsteps, all the Saulgriezis children worked to assist the family while endeavoring to graduate high school.

Toms' spent his early life on a farm in a small Latvian village.  His father drove a tractor and his mother taught kindergarten.  Toms attended school in the village.  The family had very little in the way of basic necessities and nothing in the way of material comforts.

The Saulgriezis family was so poor that they even lacked the ability to afford basic medical care.  This impacted Toms more than his other family members because he had a significant medical condition as a child.  Toms was born with a hole in his heart.  Doctors at the orphanage failed to properly examine him and diagnose his condition.  Because of his undiagnosed condition, he spent much of his childhood sick, which led to developmental issues.  As an example, he did not learn to walk until he was approximately three or four years old.

### B.    Mr. Saulgriezis' Education and Work History

Despite his early childhood set-backs, Toms' parents instilled a strong work ethic in him. Both in school and throughout his career Toms embraced the value of hard work and dedication. This is best illustrated by the fact that, during the summers in high school, Toms worked on a farm harvesting and selling apples.  He used the money he earned to pay for his school fees, textbooks, and school clothes.  Toms gave any money he had left over to his parents.

Toms graduated high school in 2009 with good grades.  However, his grades were insufficient to earn him a college scholarship and he could not otherwise afford college.  Toms decided to pursue a career as a baker, which required him to pass a health check.  This led doctors to discover the hole in Toms' heart.  It required complicated surgery that left him in the hospital for six months with an additional two months of recovery at home.  When Toms had fully recovered from his surgery, he had few employment opportunities due to his health and financial condition.  Thus, Toms pursued a carpentry degree because it was free.  Toms received his Latvian carpenter's license in 2011 and began working as a carpenter for a construction company, Sia Laimdotas, in Latvia.

In 2012, with the Latvian economy in tatters, Toms moved to Germany to pursue work. He knew he needed better opportunities, so he could continue to support his parents and younger sisters.  He quickly found work with a landscaping company, Arek Morawic, where he worked from 2012 to 2014.  Eager to succeed, in mid-2014, Toms began learning German through a government-sponsored program.  Within a year, he learned to speak German and even began working as an assistant teacher in the program.

During this period Toms also worked for a construction company, Daniel Plewinski, working on home renovation projects.  Through his hard work, Toms earned his boss' trust and soon became a project supervisor responsible for creating budgets, purchasing materials, hiring workers, supervising and working alongside them on the site, and transporting them to and from the site.  Toms worked grueling hours.  He often worked sixteen-hour days during the week and eight hours on Saturdays.  In 2014, Toms made efforts to have Germany recognize his Latvian carpenter's license and, thus, provide him with better, more lucrative opportunities.

Toms worked so hard because, by now, he had a family of his own to support.  On March 25, 2016, Toms' long-time girlfriend, Tina Skadina, gave birth to his daughter Elizabeth.  Toms knew that, in addition to supporting his parents, he needed to provide for his daughter.  And, thus, he continued to keep up his grueling work schedule.  However, he tried to return to Lavia once a month to be with his daughter.

Toms used approximately half of his monthly salary to support both his new family and parents.  He earned approximately 6,000 Euros a month and sent 2,000 Euros a month to Tina.  He paid for an apartment for Elizabeth and Tina, along with food, clothes, and other necessities such that Tina could afford to stay home and focus on raising Elizabeth.  He also sent approximately 1,000 Euros a month to support his parents and sisters, as he had done since high school, because his sisters Eva and Arta are still in young and in school.

## II.    Relevant Facts Concerning the Offense Conduct

In the fall of 2017, Toms' boss at Daniel Plewinski had to return to Poland to attend to family issues and told Toms that there would be no work for some time.  Burned out from the

long hours working construction and now without work for the near term, Toms and a friend purchased round-trip tickets for a Florida vacation.

A little less than two weeks after Toms arrived in Florida in November 2017, the friend who came with Toms to the United States told him about a business opportunity:  He would be paid for opening two bank accounts and making withdrawals.  Toms agreed to open the accounts.  However. he did not realize at the time that his friend was involving him in a criminal enterprise.  Thereafter, on a handful of occasions, Toms received instructions to withdraw specific amounts below the banks' federal reporting requirements for withdrawals from those accounts at specific branch locations.  Then Toms handed a portion of the cash to a co-conspirator and wired the rest abroad via Western Union.  In total, Toms made approximately six withdrawals and five wire transfers abroad.

When Toms began withdrawing funds for the conspiracy in December 2017, he did not know that it was part of a criminal operation.  However, in January or February 2018, Toms became suspicious that the funds came from illegal activity.  His suspicions developed upon receiving threats after he questioned why he had to make multiple withdrawals from the same account from different bank branches on the same day rather than withdrawing the whole amount from a single branch or why the funds had to be wired abroad.  Toms was told that "it's none of your business" or that "he would walk away broke" if he asked more questions.  One of participants then explained to Toms that his actions were illegal.  Chastened, Toms never raised further questions and continued to make withdrawals as instructed.

Toms' cut was 10% of the funds that he withdrew.  However, Toms only received $1,400-1,600 cash as a result of the scheme over the course six months.  The conspiracy also paid for his hotel, car rental, and food expenses up until the time he began asking questions about

5

the legality of the operation.  In the end, Toms overstayed his tourist visa.  Toms' involvement in the conspiracy was no financial windfall.  He was so broke that he could not even afford to pay for his own plane ticket back to Latvia and had to ask his sister Ance to pay for the flight.

## III.    Plea Agreement

The FBI arrested Toms Saulgriezis on June 2, 2018.  Shortly thereafter, Toms made the decision to plead guilty, so he could receive his punishment and return home to again try to support his family lawfully.  On October 22, 2018, Toms pleaded guilty, pursuant to a plea agreement, to Count One of the Superseding Information charging him with conspiracy to commit bank and wire fraud (18 U.S.C. § 1349).  *See* Plea Agreement at 1.  Toms also admitted to the forfeiture allegation with respect to Count One of the Superseding Information and agreed to forfeit, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), $55,510 to the United States, representing the amount of proceeds traceable to the commission of said offense.  *Id.* at 1-2.  In the plea agreement, the parties stipulated to an advisory Guidelines offense level of 16 and a criminal history category of I, yielding a Guidelines range of 21 months to 27 months of imprisonment.  *Id.* at 2-3.  The parties also agreed that Toms could seek a sentence below the stipulated range based on factors set forth in 18 U.S.C. § 3553(a).  *Id.* at 3.

## SENTENCING ANALYSIS

## I.    Legal Standard

As this Court is well aware, it has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*).  The Sentencing Guidelines merely provide the Court with a "starting point" or "benchmark" for fashioning a sentence.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  After determining the applicable Guidelines range, the Court "must make an

individualized assessment of the sentence warranted by Section 3553(a) based on the facts presented." *Id.* at 50.  After analyzing the Section 3553(a) factors, the Court can impose a sentence below the recommended Guidelines range.  *Id.*; *see generally*, *Kimbrough v. United States*, 552 U.S. 85, 91 (2007).

It is axiomatic that under Section 3553, the Court must consider "the nature and circumstances of the offense," "the history and characteristics of the defendant," along with the need for the sentence imposed to "reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," to adequately deter criminal conduct, and to "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(1)-(2).  In addition, the Court must seek to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  The Court should not give greater importance to the advisory Guidelines range over any of the other Section 3353(a) factors.  *See Kimbrough*, 552 U.S. at 101; *see also Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y 2005).

After analyzing the Section 3353(a) factors, the Court must fashion a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. §3553(a); *see also Gall*, 552 U.S. at 49-50.  To impose a sentence below the Guidelines range, the Court need not find "extraordinary circumstances."  *See Gall*, 552 U.S. at 47 (internal quotations omitted); *see also United States v. Jones*, 531 F.3d 163, 171 (2d Cir. 2008).  Rather, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996); *see also United States v. Bueno*, 2010 WL

7

2228570, at *3 (S.D.N.Y. June 3, 2010).  "Underlying this tradition is the principle that the punishment must fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 477 (2011) (internal citations omitted).

After considering the Guidelines range, the Section 3553(a) factors, and the time Mr. Saulgriezis has served since his arrest, Mr. Saulgriezis respectfully requests that the Court sentence him to time served.

## II.   Sentencing Mr. Saulgriezis To Time Served Would Achieve The Goals Of 18 U.S.C. § 3553(a)

### A.   History and Characteristics of Defendant

Mr. Saulgriezis' participation in this conspiracy is not the sum total of his life.  Prior to arriving in the United States, Mr. Saulgriezis led a quiet, hard-working, law-abiding life.  The 28 years Mr. Saulgriezis spent as a loving and supportive son, brother, and father should provide some measure of counterbalance against the six months he spent as a member of the conspiracy.

Although Mr. Saulgriezis' family members cannot afford to travel to New York to visit him, Mr. Saulgriezis regularly communicates with his family via email.  In addition, his sister Ance created a Skype phone number, so that Mr. Saulgriezis could talk more regularly to his family.  Ance also helped solicit letters of support from Mr. Saulgriezis' friends and family. Generally speaking, the letters describe him as a kind, peaceful man that loves his daughter deeply, and works hard to financially support her, his parents and sisters.  *See* Exh. A (Letter from Dace Saulgriezis), Exh. B (Letter from Ance Saulgriezis), Exh. C (Letter from Madara Lejina), Exh. D (Letter from Martins Friebergs), Exh. E (Letter from Liga Singh), Exh. F (Letter from Kristine Silina), Exh. G (Letter from Madara Morawiec), and Exh. H (Letter from Patrīcija Bāra).  Mr. Saulgriezis' mother, Dace, described him "a loving, caring and generous person." *See* Exh. A (Letter from Dace Saulgriezis).  She noted how much she, her husband, and

8

Elizabeth, Mr. Saulgriezis' daughter, relied on Mr. Saulgriezis' financial support, including payments for Dace's medical bills.  *See id.*; *see also* Exh. B (Letter from Ance Saulgriezis).  His best friend, Madara, explained how Mr. Saulgriezis emotionally supports friends through difficult situations and always serves as a willing shoulder to cry on.  *See* Exh. C (Letter from Madara Lejina).

Mr. Saulgriezis' employment history is evidence of his work ethic and aversion to taking the easy way out.  Unable to afford college, Mr. Saulgriezis obtained his carpentry license and left his family to pursue better economic opportunities in Germany.  As a German immigrant, Mr. Saulgriezis learned German, assisted in teaching it to others, found gainful employment, and worked his way up to supervisor.  This is the Mr. Saulgriezis his friends and family know.  This is who he has been for the vast majority of his life, not the person who made a serious error in judgement that brings him before the Court.

In the context of Mr. Saulgriezis' entire life, his participation in this conspiracy is an aberration.  The rest of his life has been focused on family, friends, and work.  These solid pillars warrant a downward variance and will ensure that Mr. Saulgriezis does not reoffend following his sentence.

### B.     The Guidelines' Disproportionate Emphasis on Loss Amounts Overstates Mr. Saulgriezis' Minor Role in the Conspiracy

The loss enhancements of the § 2B1.1 Sentencing Guidelines, which are not grounded on empirical findings, unnecessarily increase Mr. Saulgriezis' Guidelines range.  These inflated enhancements account for six of Mr. Saulgriezis' sixteen-point base offense level.

The § 2B1.1 Guidelines' undue focus on loss amount "effectively guarantee[s] that many such sentences would be irrational on their face."  *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014).  Judges in this courthouse and within

this Circuit have reached similar conclusions and imposed sentences below the Guidelines range. *See id.* at 353, 355 (sentencing defendant to 24 months where the Guidelines ranged from 78 to 92 months' imprisonment); *United States v. Adelson,* 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (imposing a sentence of 42 months where the Guidelines calculation range included life imprisonment); *United States v. Parris,* 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (imposing a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life).  In *Gupta*, Judge Rakoff calculated that the defendant's actions resulted an illegal gain or avoidance of loss of $5,032,195, which would have resulted in an eighteen-point enhancement but imposed a sentence of 24 months.  *See Gupta*, 904 F. Supp. 2d at 353, 355.  Here, the parties agreed that the amount of proceeds traceable to the commission of the offense was $55,510.  *See* Plea Agreement at 2.  Thus, if the Court sentences Mr. Saulgriezis to 24-months' imprisonment, which would be within the stipulated Guidelines range of 21 to 27 months, Mr. Saulgriezis would serve the same sentence as the defendant in *Gupta* despite a loss amount nearly 1% the size of that in *Gupta.*[1]

The government may argue, as it did in their sentencing submission for Aleksandrs Mukans, that the sentencing guidelines critiques in *Gupta, Adelson*, and *Parris* are "inapposite" here because the losses in those cases are caused by "market fluctuations, especially where the defendant received no monetary gain" and were not "driven by *actual* loss to the victims."  *See* Exh. I Government Sentencing Submission, *United States v. Aleksandrs Mukans*, 16 Cr. 692 (JFM) (S.D.N.Y. December 5, 2017) (emphasis in original).  However, the government's focus on those defendants' personal monetary gain is instructive in Mr. Saulgriezis' case as well.  In

---

[1] Mr. Saulgriezis acknowledges that Mr. Gupta led an exceptionally charitable life and deserved credit for it.  But Mr. Saulgriezis is as charitable as his life allows.  He has lived a hard-working life dedicated to helping his family and this is worthy of credit as well.

*Parris*, the defendants generated $4.9 million in illicit funds from "over 500 individuals" in "a rather typical 'pump and dump' scheme." *Parris*, 573 F. Supp. 2d at 746-749.  In *Gupta*, two-thirds of the defendants total Guideline points were the product of his accomplice's gain, "from which Mr. Gupta did not in any direct sense receive one penny." *Gupta*, 904 F. Supp. 2d at 350. Similar to the defendant in *Gupta* and unlike the defendants in *Parris*, Mr. Saulgriezis saw little monetary gain from his role in this conspiracy.  Although the loss amount in this case is $55,510, Mr. Saulgriezis only received a fraction of that amount—less than $2,000 cash.

The Sentencing Commission's failure to empirically justify the weight of each Section 2B1.1 factor underlies the criticism of the Guidelines range in cases such as this one.  *See*, *e.g.*, *Adelson*, 441 F. Supp. 2d at 510 ("The [Sentencing] Commission has never explained the rationale underlying any of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic.") (internal citation omitted); *Gupta*, 904 F. Supp. 2d at 350 ("Imposing a sentence on a fellow human being is a formidable responsibility.  It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.  The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.").  "The numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice." *Gupta*, 904 F. Supp. 2d at 351.  This is especially true for loss enhancements, which are "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger,* 329 F. Supp.2d 416, 427-28 (S.D.N.Y. 2004).

Here, Mr. Saulgriezis' decisions did not drive the loss amount.  He was directed to withdraw certain amounts and he did.  Simply put, the loss amount here is not representative of Mr. Saulgriezis' relatively minor role in the conspiracy.  Although Mr. Saulgriezis performed an integral function for the conspiracy by withdrawing illicit funds, his role is secondary to the codefendants who placed the false ads, contacted the victims, or managed the "money mules." Additionally, the loss amount in this case is at the low end of the six-level enhancement for offenses involving losses of more than $40,000 but less than $95,000.

The loss Guidelines overstate Mr. Saulgriezis' role in the operation.  As a result, Mr. Saulgriezis respectfully requests that the Court "place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."  *Adelson,* 441 F. Supp. 2d at 515.  Accordingly, this Court should disregard or discount the loss Guidelines.

### C.   Mr. Saulgriezis Should Receive a Sentence Below the Guidelines Range to Avoid Sentencing Disparities

Under Section 3553(a), the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Appellate courts in this Circuit have interpreted this requirement as a means to eliminate sentencing disparities nationwide.  *See United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007), *abrogated on other grounds by Kimbrough*, 552 U.S. 85 (2007).  However, this Court may also consider sentences for similarly situated codefendants. *See, e.g.*, *United States v. Ford*, 320 F. App'x 50, 52 (2d Cir. 2009); *Simon v United States*, 361 F. Supp. 2d 35, 49 (E.D.N.Y. 2005).

A sentence below the Guidelines range would align this case with similarly situated defendants nationwide, within this Circuit, and within this District.  According to the Sentencing

12

Commission,[2] for fiscal year 2017, on average, defendants nationwide with a Criminal History Category ("CHC") of I sentenced pursuant to Section 2B1.1 received a sentence of 20 months with a median of 10 months, with a corresponding average loss amount of $5,091,202 and a median loss amount of $140,420.  In the Second Circuit, such defendants received an average sentence of 16 months with a corresponding average loss amount of $3,744,744.  In this District, such defendants received an average sentence of 17 months with a corresponding average loss amount of $2,876,022.  Because Mr. Saulgriezis has no prior arrest record, his criminal history score is zero, which corresponds to a CHC of I.  *See* PSR at ¶45-47.

As discussed above, the loss amount in this case is $55,510, less than half the median loss in similar cases nationwide and 2% of the average loss in similar cases in this District.  Both the average and median sentences for similarly situated defendants nationwide are below the Guidelines in this case.  The same is true for the average sentences in this Circuit and within this District.  Mr. Saulgriezis respectfully requests that this Court recognize the sentences imposed in similar cases by its sister courts throughout the nation, in this Circuit, and within this District by imposing a sentence below the Guidelines range in this case and not creating unwarranted sentencing disparities.

Sentencing Mr. Saulgriezis to a term of imprisonment below the Guidelines range would also avoid creating unwarranted sentencing disparities as to the codefendants in this case. Relative to his codefendants, Mr. Saulgriezis is most similarly situated to codefendants

---

[2] The below information on sentence length and loss amount was obtained from the Sentencing Commissions' Interactive Sourcebook of Federal Sentencing Statistics, including the tables "Sentence Length for Offenders in Each Criminal History Category by Primary Sentencing Guideline (*available at* https://isb.ussc.gov/api/repos/:USSC:table_xx.xcdf/generatedContent?table_num=Table14AG) and Loss Amounts by Selected Primary Sentencing Guidelines ( *available at* https://isb.ussc.gov/api/repos/:USSC:table_xx.xcdf/generatedContent?table_num=Table102).

Aleksandrs Mukans and Ivars Ozols, who both received below Guidelines sentences.  Similar to

Mr. Mukans and Mr. Ozols, Mr. Saulgriezis withdrew illicit funds and wired them abroad, and

did not have a supervisory role in the conspiracy.  *See* Exh. J, Defendant Sentencing Submission,

*United States v. Aleksandrs Mukans*, 16 Cr. 692 (JFM) (S.D.N.Y. Jan 29, 2018); Exh. K,

Government Sentencing Submission, *United States v. Ivars Ozols*, 16 Cr. 692 (JFM) (S.D.N.Y.

January 29, 2019).  Mr. Mukans, however, was a "seasoned participant" in the conspiracy who

traveled from New York to Miami to further the fraud.  *See* Exh. J.  Unlike Mr. Mukans, Mr.

Saulgriezis' participation in the conspiracy only took place in one state and involved a handful of

withdrawals over a limited time period.  For Mr. Ozols, this Court found that the applicable

Guidelines range was 51 to 63 months' imprisonment but sentenced Mr. Ozols to 39 months'

imprisonment, 12-months less than the bottom of the Guidelines range.  *See* Exh. L Tr. 9:20-24,

32:3-7 (Sentencing Hearing Transcript, *United States v. Ivars Ozols*, 16 Cr. 692 (JMF) (February

12, 2019).  If this Court sentences Mr. Saulgriezis to 12-months less than his Guidelines range,

as it did in *Ozols*, it would sentence him to 9 months' imprisonment, slightly less than he will

have served at the time of his sentencing hearing.

     Sentencing Mr. Saulgriezis below the Guidelines range would satisfy Section 3553(a)(6)

by aligning his sentence with similarly situated defendants nationwide, within this Circuit, within

this District, and within this case.

### D.    A Long Sentence Would Have a Negative Impact on Mr. Saulgriezis' Daughter, Parents, and Sisters

     Courts in this Circuit may consider family circumstances, especially those involving

young children, in fashioning variances for below-Guidelines sentences. *See United States v.*

*Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997) (affirming downward departure where "removal of

the father from this unit at this particular point in time would have a disastrous effect on the [8

and 9 year old] children in terms of possibilities of their education and upbringing.") (quoting district court opinion); *United States v. Alba*, 933 F.2d 117, 1122 (2d Cir. 1991) (affirming downward variance where defendant had "a close-knit family whose stability depends on [his] continued presence.").[3]

Without Mr. Saulgriezis' income, his daughter, Elizabeth, and Elizabeth's mother, Tina, have struggled financially.  They were unable to afford their apartment and had to relocate.  They now live with Tina's older sister.  Mr. Saulgriezis' parents and his two youngest sisters also rely his financial assistance.  In particular, his mother's health has deteriorated recently, and she will undergo an operation at the end of March, which she cannot afford.  *See* Exh. A (Letter of Dace Saulgriezis) *and* Exh. B (Letter of Ance Saulgriezis).  She also noted that her husband is working despite significant disabilities and physical pain because, without his income and Mr. Saulgriezis' support, they would be homeless.  *See* Exh. A (Letter of Dace Saulgriezis).

Once Mr. Saulgriezis completes his term of incarceration, he plans to try to get his old job back with Daniel Plewinski.  His sister Liga has also offered to have Mr. Saulgriezis stay with her in Dublin, where Liga's husband has indicated that he could find Mr. Saulgriezis work. In addition to the remorse Mr. Saulgriezis feels for violating the law, he also regrets that his actions have harmed his family and hopes to return to helping those he has hurt as quickly as possible.

---

[3] To be clear, Mr. Saulgriezis is requesting the Court impose a downward variance and not a downward departure from the Guidelines.  Mr. Saulgriezis understand the Plea Agreement prevents him from requesting a downward departure.  *See* Plea Agreement at 3.

### E.    Mr. Saulgriezis' Acceptance of Responsibility for His Conduct and Post-Offense Rehabilitation Favor a Downward Variance

Mr. Saulgriezis pled guilty to conspiracy to commit bank and wire fraud (18 U.S.C. § 1349).  Mr. Saulgriezis has acknowledged the seriousness of this offense and has expressed remorse for his conduct.  By pleading guilty well before the eve of trial, Mr. Saulgriezis demonstrated that he unequivocally takes responsibility for his actions.  During his allocution, Mr. Saulgriezis emphasized that he was "very sorry that [his] action [sic] hurt innocent peoples [sic]."  Mr. Saulgriezis' post-offense rehabilitation is further evidence that he has accepted responsibility for his role in the conspiracy.

The Court should consider Mr. Saulgriezis' efforts towards remaining a productive person while awaiting sentencing as further support for a downward variance.  *See United States v. Barton*, 76 F.3d 499, 503 (2d Cir. 1996) ("A court may depart from the applicable guideline range in view of the defendant's efforts toward rehabilitation."); *United States v. Wong*, 40 F.3d 1347, 1382 (2d Cir. 1994) ("[I]t is well established that a district court should consider a defendant's potential for rehabilitation in determining a sentence.").  Since Mr. Saulgriezis arrived at the Metropolitan Detention Center[4] approximately nine months ago, he has served his time without a single disciplinary infraction.  *See* PSR at ¶12.  In addition, Mr. Saulgriezis works in the laundry and began taking yoga classes in December 2018.  *See* PSR at ¶63.  Mr.

---

[4] As this Court is aware, MDC suffered a power outage this month that, along with administrative blunders, caused the inmates to suffer particularly harsh conditions.  For days Mr. Saulgriezis was locked in a cell throughout the day without heat or a blanket.  When the cells were opened for short periods, the showers were cold.  The prison meals were uncooked leading inmates to refuse them.  Mr. Saulgriezis refused to eat the prison food, not because it was uncooked, but because other prisoners threatened to beat inmates who accepted the meals.  We ask the Court to take these harsh conditions into consideration as support for a downward variance.

Saulgriezis will continue to serve his sentence as quietly and productively as possible because he wishes only to return to his loving family and continue to support them.

**F.      Request for Judicial Order of Removal**

Mr. Saulgriezis hopes to return home to his family as soon as possible.  To that end, he has waived his rights under the Immigration and Naturalization Act of 1986 and consented to the immediate entry of an Order of Removal in an effort to shortcut the administrative delays that usually attend removal proceedings.  *See* 8 USC §1228(c)(5).  We have informed the government of Mr. Saulgriezis' position and the government has agreed to facilitate.  At sentencing, we will respectfully request that Your Honor make certain findings and enter a Judicial Order of Removal.

While Mr. Saulgriezis does not qualify for treatment under the policy set forth by the Attorney General known as "Fast Track," which permits certain defendants who agree to immediate removal to receive up to a four-level downward departure under §5K3.1 of the Guidelines, the rationale underlying the departure is applicable here.  For instance, these agreements free up scarce law enforcement resources for other significant priorities.  In Mr. Saulgriezis' case, there is little point for the American taxpayer to continue to pay for Mr. Saulgriezis' housing, food, education, and medical treatment, when he will be deported immediately after he completes his sentence.

<b>CONCLUSION</b>

For the foregoing reasons, Mr. Saulgriezis requests that the Court sentence him to time served.

Dated: February 26, 2019

Respectfully submitted,

/s/ Gregory Morvillo
Gregory Morvillo
Spencer Bruck
**ORRICK, HERRINGTON & SUTCLIFFE**
51 WEST 52ND STREET
New York, New York 10019
(212) 506-5000

*Attorneys for Defendant Toms Saulgriezis*